**Albert M. VOSBURG, III, Appellee**

v.

**NBC SEVENTH REALTY CORP., and Pittston Area Industrial Development Corp.,**

**Appeal of NBC Seventh Realty Corp.**

Superior Court of Pennsylvania.

Argued April 15, 2015.
Filed Sept. 2, 2015.

Brian T. Feeney, Philadelphia, for appellant.

John J. Hovan and Aaron D. Hovan, Tunkhannock, for Vosburg, A., III, Vosburg, A., Jr. and Estate of Garey, appellees.

Sean P. McDonough, Moosic, for Vosburg, S., appellee.

BEFORE: BOWES, DONOHUE, and ALLEN, JJ.

OPINION BY BOWES, J.:

NBC Seventh Realty Corporation ("NBC") appeals from the trial court's order denying its motion to vacate the trial court's order granting partial summary judgment [1] in favor of the heirs of Albert and Katherine Vosburg (collectively the "Vosburgs") [2] and its own motion for summary judgment. We reverse and remand for the entry of summary judgment in favor of NBC.

This litigation involves property in Luzerne County that was conveyed by Albert M. and Katherine Vosburg to Anthony Fritz by deed ("Deed") dated May 11, 1951. The Deed conveyed

all that certain piece or parcel of land situate in the Township of Pittston ... bounded and described as follows, to wit:

BEGINNING at a corner of land now or late of Norman Lampman in the east line of David Young Warrant; thence along said Warrant line North seventy and eight-tenths (70.8) rods to a stone

---

1. By order dated June 27, 2014, the trial court denied NBC's motion to determine finality, or in the alternative, certify the interlocutory order for appeal. NBC filed a petition for review to this Court seeking review of an uncertified, interlocutory order pursuant to Pa.R.A.P. 341(c)(4), which authorizes the filing of a petition for review within thirty days of the order denying the application for a determination of finality. This Court granted the petition for review on September 18, 2014.

2. This action was originally commenced by Albert M. Vosburg III, who claimed sole ownership of the coal and mineral rights reserved in the 1951 Deed. He subsequently renounced his claim to sole ownership of the reserved mineral estate and filed a third amended complaint in June 2003 in which he acknowledged other heirs of Albert M. and Katherine Vosburg as parties with an interest in the mineral estate and joined them as plaintiffs. The caption does not reflect their joinder.

corner; thence, East two-hundred twenty-six (226) rods to a stone corner; ...

**EXCEPTING AND RESERVING all coal and other mineral beneath the surface of said described land, with the right to mine and remove the same by subterrane mining.**

**IT IS UNDERSTOOD AND AGREED that no buildings erected on said land, or field under cultivation, will be disturbed by said mining.**

Being the same land described in a deed from Burr B. Vosburg, single to Albert M. Vosburg, male grantor herein, dated 18th of February, 1930, and recorded in the office of Recorder of Deeds in and for Luzerne County in Deed Book No. 1066, Page 631.

Deed, 5/11/51, at 1 (emphases supplied).

The Fritz parcel was subsequently sold to the Pittston Area Industrial Development Corporation ("PAID").[3] In 2002, NBC Realty purchased 105 acres of land from PAID to build a commercial distribution center. Approximately fifty of those acres consisted of the Fritz parcel, which was subject to the foregoing mineral rights reservation. Construction of the building, parking areas, and access roads necessarily involved excavation and regrading of the surface to accommodate this use. The contractors used crushed rock from the site and procured additional material from an off-site source as fill.

On October 11, 2002, Albert Vosburg III filed a complaint against NBC and PAID alleging that the aforementioned excavation and processing of rock on the site constituted trespass and conversion of the mineral rights estate. Specifically, he alleged that NBC and PAID exceeded their surface rights when they excavated hardened shale on the Fritz parcel to a depth of approximately fifty feet and removed and processed the rock for use as subbase and fill for the construction of the warehouse on the property. He contended that the hardened shale was a mineral under Pennsylvania law with a minimum value of $3.00 per ton.[4]

NBC denied that it' removed any rock from the Fritz Parcel. It contended further that the rock herein was not a mineral because it was not metallic. Finally, NBC maintained that the rock herein, located on and near the surface, was not contemplated within the mineral reservation since it was not extractible by underground mining.

On June 10, 2010,[5] the Vosburgs moved for partial summary judgment on two issues. First, they asked the court to rule that they are the owners of the mineral estate.[6] Second, they sought a determination that PAID and NBC's use of the property constituted a trespass of their mineral estate and conversion of the minerals located therein. The trial court applied the scientific definition of a mineral

---

3. PAID did not file a notice of appeal and thus is not participating in the within appeal.

4. The nature of the rock remains disputed. The Vosburgs refer to the extracted material as hardened shale, sandstone, and rock. NBC offered the results of test borings that revealed that the Fritz Parcel consisted of sand, silt, gravel, and disintegrated rock in the top five feet of the strata, and "moderately to slightly fractured" sandstone below that depth. However, that factual dispute is not material to our disposition of this appeal.

5. The record reveals that there were extensive periods when the Vosburgs failed to actively prosecute this action.

6. The court's ruling that the Vosburgs are owners of the mineral reservation is not challenged on appeal. The controversy before us turns on whether rock is included within that mineral reservation.

and held as a matter of law that rock was a mineral. It then concluded that the cut and fill work of NBC and PAID constituted a trespass of the mineral rights reservation, and the crushing of the rock for use as fill and support was a conversion. On December 3, 2010, the court granted partial summary judgment in favor of the Vosburgs.

On March 11, 2014, NBC sought to vacate the trial court's December 3, 2010 order and moved for summary judgment in its favor based upon the Supreme Court's decision in *Butler v. Charles Powers Estate,* 620 Pa. 1, 65 A.3d 885, 898 (2013). Following oral argument, the trial court denied the motion to vacate. This Court granted NBC's petition for review of the order on September 18, 2014, resulting in the instant appeal. NBC presents two issues for our review:

1. Is it error under Pennsylvania law for a trial court to construe the term "mineral" in a private deed reservation to include rock on the basis that rock is within the scientific understanding of "mineral"?

2. Is it error under Pennsylvania law for a trial court to hold that a plaintiff owns rock based upon a private deed reservation for "coal and other mineral" where the parties to the deed did not include "rock" in the text of the deed and the plaintiff did not plead or produce clear and convincing proof that the parties to the deed intended to include rock within the reservation?

Appellant's brief at 2.

Both of NBC's issues implicate the propriety of the trial court's grant of partial summary judgment in favor of the Vosburgs.

Our scope of review ... of summary judgment orders ... is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law will summary judgment be entered.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. Thus a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury. Upon appellate review we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate Court may disturb the trial court's order only upon an error of law or an abuse of discretion.

*Alexander v. City of Meadville,* 61 A.3d 218, 221 (Pa.Super.2012) (internal citations omitted).

NBC contends first that the trial court erred as a matter of law in holding that rock is a mineral based solely upon the scientific definition of mineral. It argues that our Supreme Court in *Butler* rejected the scientific definition when construing

the meaning of minerals in reservations in private deeds and confirmed that the meaning is "to be determined not by principles of science, but by common experience directed to the discovery of intention." *Butler*, 65 A.3d at 898. According to NBC, in reaffirming that a reservation of "coal and other mineral" in a private deed presumptively does not include natural gas and oil, the *Butler* Court acknowledged that the common layperson's understanding of "mineral" encompasses only materials that are metallic in nature, such as gold, silver, iron, copper, and lead. *See Gibson v. Tyson*, 5 Watts 34 (Pa.1836); *Dunham v. Kirkpatrick*, 101 Pa. 36 (1882). NBC relies upon this language in *Butler* in support of its contention that the non-metallic rock at issue is presumptively not a mineral.

Additionally, NBC contends that it is clear from the language of the Deed reservation that only coal and minerals beneath the surface that could be removed and mined "subterrane" were included in the reservation. Rock that could only be quarried rather than deep-mined was not contemplated within the mineral reservation.

Our courts have wrestled for almost two centuries with the meaning of the term "mineral" in private deeds and conveyances. In *Dunham, supra*, the Court acknowledged that virtually all inorganic materials are minerals in the general sense, but that the meaning of the word as used in a deed reservation or grant had to be limited in order to leave something for the other party. The *Dunham* Court reasoned:

> It is true that petroleum is a mineral; no discussion is needed to prove this fact. But salt and other waters, impregnated or combined with mineral substances, are minerals; so are rocks, clays and sand; anything dug from mines or quarries; in fine, all inorganic substances are classed under the general name of minerals: Bou. L. Dic.; Wor. Dic.; Dana's Geology; Grey's Botany. But if the reservation embraces all these things, it is as extensive as the grant, and therefore void. If, then, anything at all is to be retained for the vendor, we must, by some means, limit the meaning of the word "minerals."

*Dunham* at 44.

In *Gibson*, one of the early cases to address the issue, the question was whether a reservation in a deed of "all mineral or magnesia of any kind" ... "and all bricks and blocks of soapstone," included chrome. *Gibson*, at 41. The Court noted at the outset that agreements should be construed according to the meaning and understanding of the parties at the time they entered into them. While recognizing that minerals were usually of a "metallic nature, such as gold, silver, iron, copper, lead," the Court noted that one of the parties to the conveyance testified that at the time of the reservation, chrome was thought to be a metal of some kind, and perceived as containing some gold or silver. *Id.* The Court found that the mineral reservation included chrome. Years later, in distinguishing the holding in *Gibson*, the *Dunham* Court explained that while chrome would not ordinarily have been included in the common sense of the term mineral, "the parol evidence showed very clearly that the term "mineral" was introduced into the exception for the express purpose of embracing the chrome." *Dunham, supra* at 44.

*Dunham* involved a reservation "Excepting and reserving all the timber suitable for sawing; also, all minerals; also, the right of way to take off such timber and minerals." *Dunham, supra* at 43. Pursuant to that reservation, the defendants erected a derrick and drilled for oil.

The issue before the Court was whether petroleum was included in the exception for "all minerals." The *Dunham* Court conceded that "the word 'minerals' in its most comprehensive signification includes petroleum." *Id.* However, the question remained whether the parties to the agreement and deed used the word in the expansive or restricted sense. The Court concluded that when the contract was made, the parties did not intend to reserve the oil that would subsequently be found or they would have expressed that "in no doubtful terms." *Id.* at 44. It posited that the parties were likely unaware of the presence of oil at the time of conveyance or, if they knew of it, they were mistaken in hoping to reserve it under the general term mineral, which was not the common understanding of oil at the time. The Court held that petroleum was not included within the reservation. This holding has become a rule of property known as the *Dunham* Rule: the rebuttable presumption that "if, in connection with a conveyance of land, there is a reservation or an exception of 'minerals' without any specific mention of natural gas or oil, ... the word 'minerals' was not intended by the parties to include natural gas or oil." *Butler, supra* at 886.

Much of the litigation surrounding the term mineral involves natural gas or oil. However, in *Hendler v. Lehigh Valley R.R. Co.*, 209 Pa. 256, 58 A. 486 (1904), the issue before the court was whether "or other mineral" language in a deed included sand. Hendler sold a fifty-foot right-of-way over his land to permit construction of a railroad. When the railroad used a large quantity of sand taken from outside of the right-of-way, he sued in trespass to recover damages for its excavation and taking. At issue was whether the reservation "excepting and reserving, however .... all the coal and other minerals in, under, or upon said lot of land, and also reserving, as

aforesaid, the unrestricted right and privilege of mining and removing all of said coal and minerals, or any part thereof" included sand. *Id.* at 487. In a subsequent deed, there was a further exception for "all the gravel necessary for any fill or ballast for the railroad." *Id.*

The Court noted that in the broadest sense, sand was a mineral. In the scientific sense, its composition determined whether it was a mineral. It concluded, however, that it was clear from the deed itself that the parties did not use the word mineral in either of those senses because, under either definition, gravel would have been included and there would have been no need for a special exception. The *Hendler* Court posited that perhaps mineral should be viewed in the commercial sense and include inorganic substances that are mined or quarried which have sufficient value when separated from the land, "to induce the expense and labor of severance for their own sakes." *Id.* The Court suggested that a vein of fine marble, granite, limestone or other building material, or pure white quartz sand used in the production of glass, might fall within the reservation, but common mixed sand used as grading material did not. Although the sand was not a mineral within the meaning of the reservation, the *Hendler* Court upheld the award for the plaintiff on the alternative basis that the railroad took the sand from the plaintiff's property, carried it away, and used it on other property.

In *Silver v. Bush*, 213 Pa. 195, 62 A. 832 (1906), the issue was whether a reservation of mineral rights included natural gas. Noting that the word mineral was a word of general language and "presumably is intended in the ordinary popular sense[,]" the Court recognized that in a particular case it may have a different meaning. Viewing the issue as one of contract, the Court concluded that different meaning

"should clearly appear as intended by the parties." *Id.* at 833.

The Vosburgs direct our attention to a recent federal district court decision in *PAPCO Inc. v. United States Forest Serv.,* 814 F.Supp.2d 477, 495 (W.D.Pa.2011), addressing whether sandstone was included in a reservation of "all the . . . minerals of every kind and description whatsoever" in a 1931 deed. That court concluded, based on *Hendler,* that the intention was to reserve all commercially valuable minerals, and since the parties knew of the presence of sandstone and were likely aware of its value, it was within the scope of the reservation.

The Vosburgs cite *PAPCO* in support of the trial court's conclusion that commercially valuable rock is a mineral. However, the conclusion in PAPCO was that the parties **intended to** reserve all commercially valuable minerals, limestone being one of those minerals. NBC contends that the trial court herein did not determine the intent of the parties but merely relied upon the scientific and geological definitions of a mineral in concluding that the rock was included within the reservation as a matter of law.

We agree with NBC that our courts, most recently Butler, have repeatedly rejected the notion that the scientific or dictionary definition of mineral is controlling when construing a coal and mineral reservation in a deed. *Butler* reaffirmed the long-held belief that, generally, we must look to the popular and common use of the word and the intent of the parties at the time of the reservation or grant in construing its meaning. Thus, the trial court erred in relying upon the scientific defini-

tion of mineral as the basis for its entry of partial summary judgment.

■ However, in citing *Butler* for the proposition that there is a presumption that the word "mineral" includes only ores and metals, not rock, NBC misses the mark. Language in *Butler* regarding the common perception of minerals as metals did not create a *Dunham*-like rule with regard to non-metallic rock.[7] With the exception of oil and gas, where the *Dunham* Rule applies in construing a mineral rights reservation, our primary object must be to ascertain and effectuate what the parties themselves intended. *Mackall v. Fleegle,* 801 A.2d 577, 581 (Pa.Super.2002). In doing so, we must look first to the language of the deed.

■ Rules for construing a reservation in a private deed were developed in *Brookbank v. Benedum–Trees Oil Company,* 389 Pa. 151, 131 A.2d 103 (1957) and *Yuscavage v. Hamlin,* 391 Pa. 13, 137 A.2d 242 (1958), and summarized in *Highland v. Commonwealth,* 400 Pa. 261, 161 A.2d 390, 398 (1960):

> Among such rules are those providing: (1) the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words; (2) effect must be given to all the language of the instrument and no part shall be rejected if it can be given a meaning; (3) the language of the deed shall be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed.

---

7. *Butler* reaffirmed the *Dunham* Rule, which provides that in a reservation or an exception of 'minerals' in a conveyance of land, where there is no specific mention of natural gas or oil, there is a rebuttable presumption that the term "minerals" was not intended by the parties to include natural gas or oil.

*Id.; see also Ralston v. Ralston,* 55 A.3d 736 (Pa.Super.2012). In addition, reservations in deeds are to be construed against the grantor. *Wilkes–Barre Township School Dist. v. Corgan,* 403 Pa. 383, 170 A.2d 97 (1961).

With these principles in mind, we examine the Deed at issue. We note that there is no reference to rock, shale, or stone in the Deed. In the description of the property, stone corners denote boundaries, suggesting that boulders were visible on the surface. Thus, we can assume from the Deed itself that the parties knew about the presence of rock or stone and that any reservation would reflect their intentions in this regard. The reservation, however, makes no specific mention of rock, stone, or quarrying.

Furthermore, the Grantors did not reserve all coal and minerals, but only coal and minerals beneath the surface. In addition, rather than reserve all methods of extracting the coal and minerals, they reserved only one method: "subterrane" mining, meaning underground mining. Moreover, the Deed contains the parties' agreement that no buildings or crops on the surface would be disturbed by the subterrane mining, which evidences their intent to preserve the surface and subjacent support for the benefit of the surface owner.

NBC contends that it is clear from the language of the Deed that only coal and minerals beneath the surface that could be removed and mined "subterrane" were included within the reservation. The Vosburgs maintained throughout that, to the contrary, their predecessors' reservation of minerals "included by implication the right to enter upon the Fritz Parcel and to remove coal and minerals **where ever** [sic] located subject to Defendants' right of support." Plaintiff's Answer to Defendants' Preliminary Objections [to amended Complaint], 2/26/03, at ¶ 11 (emphasis supplied). This included by implication the right to quarry on the property. In support of that position, they point to the fact that the parties to the Deed were involved in quarrying; Albert Vosburg owned a quarry on nearby property and Anthony Fritz worked at the quarry.

We find merit in NBC's construction of the language in the Deed. The plain language of the reservation did not reserve to the Grantors the right to all coal and mineral, but only to the coal and mineral **beneath the surface** that could be underground mined. We acknowledge that a reservation of mineral rights generally confers reasonable use of the surface to access those minerals, but reasonable access herein would be that necessary to underground mine, not to open pit quarry or strip mine.

We find no support in either the Deed or Pennsylvania law for the Vosburgs' contention that the reservation included the right to quarry on the property. *Rochez Bros., Inc. v. Duricka,* 374 Pa. 262, 97 A.2d 825 (1953), is instructive in this regard. Therein, the plaintiff became the owner of the rights to two coal reservations in deeds. One reservation included the coal underlying several acres, together with the right to mine and carry away all of the coal, including draining and ventilating, without providing for the support of the surface. The other reservation preserved "[t]he full, free, and exclusive right to enter in, upon, and under, the lands hereby conveyed for the purpose of exploring, drilling for, testing, and digging, mining, draining, storing, shipping, transporting and operating said reserved coal, . . . without liability for damages to the surface." *Id.* at 825. The issue before the Court was whether the reservations permitted the plaintiff company to remove coal through

strip mining methods or whether it was restricted to shaft mining.

Our Supreme Court found that since strip mining stripped away the surface and horizontally withdrew the mineral deposits, "as a can opener lays bare the contents of a box of sardines," no land owner or purchaser would casually treat such rights. *Id.* at 826. The Court held that the right to enter "in, upon and under the lands" for mining purposes contained no right to remove the overlying surface. *Id.* Additionally, it noted that if the grant was intended to include strip mining, the immunity for damages to the surface would be meaningless and the right to ventilate would be superfluous. Our High Court construed the reservations as including only underground mining, not the right to strip the surface by strip mining. *See also Wilkes–Barre Twp. Sch. Dist., supra* (relying upon *Rochez Bros., supra* in interpreting coal reservation as including only right to vertically mine, not strip mine); *Stewart v. Chernicky, supra* (The right to mine and remove coal by deeds conveying land in language peculiarly applicable to underground mining does not include the right

to remove such coal by strip mining methods.).[8]

Since rock at or near the surface cannot feasibly be removed via deep mining, and quarrying destroys the surface even more than strip mining, the "subterrane mining" limitation is powerful evidence that Vosburgs' predecessors did not retain any right to quarry the rock or to the rock itself. The obligation of the mineral rights owner to deep mine in a manner that would not disturb buildings and surface crops is further proof that the right to surface mine or quarry was not reserved.

Nor are we persuaded by the Vosburgs' assumption that because the parties were involved in quarrying, quarrying was the purpose for reservation. There is no indication that the Grantors intended to reserve the right to quarry on the property. Indeed, one would expect that if quarrying was contemplated, the Grantors would have retained ownership of the surface or specifically reserved the right to surface mine or quarry. They did neither.[9] One would have to question why Mr. Fritz

---

8. Other jurisdictions have reached the same conclusion on similar facts. In *Beury v. Shelton*, 151 Va. 28, 144 S.E. 629 (1928), the court reasoned that if the parties had intended to reserve limestone and the right to quarry, which would have made the surface grant ineffectual, they would have done so explicitly in the instrument. The court construed the proviso that the "mining, digging and removing" of the minerals and metals "shall be done with as little injury to the growing crops as conveniently and reasonably may be," as indicating that the parties did not contemplate limestone, which could be obtained only by the quarry or open-pit method and concomitant destruction of the surface, within the reservation.

In *Acker v. Guinn*, 464 S.W.2d 348 (Tex. 1971), in determining whether iron ore was a mineral within the meaning of the deed reservation, the Court held that such a reservation should not be construed to include a substance that must be removed by methods that

will deplete the surface estate, unless a contrary intention is clearly expressed.

Since bauxite could only be removed via open pit-mining, and the surface owner purchased the property for a home and farm, the court held bauxite was not in the contemplation of the parties to the contract when this reservation of mineral rights was made. *Carson v. Missouri P.R. Co.*, 212 Ark. 963, 209 S.W.2d 97 (1948).

9. The Vosburgs aver that their predecessors entered the Fritz parcel by way of a township road and "conducted open pit quarrying of hardened shale located upon the Fritz Parcel before and after the conveyance of the surface of the Fritz Parcel." Plaintiffs' Answer to Defendants' Preliminary Objections, 1/5/03, at ¶ 9. Such a claim, even if substantiated, does not alter the plain language of the reservation.

would have paid any sum for property that the Vosburgs would destroy by quarrying.

Our reading of the Deed gives effect to "the apparent object or purpose of the parties and the conditions existing when it was executed." *Highland, supra* at 398. The Vosburgs' proposed construction of the reservation fails to give effect to the language limiting mineral rights to those beneath the surface. One would also have to ignore the proviso that access was limited to underground mining. Additionally, since quarrying destroys the surface, it is inconsistent with the contemplated use of the surface for buildings or crops.

Construing the reservation against the Grantors as we are compelled to do, we find that the Grantors' restriction of their reservation to coal and mineral **beneath the surface** and removable via **subsurface mining only** revealed no intention to include the rock herein, which was removable by quarrying only. This interpretation is ascertainable from the instrument itself and gives effect to all of its language.

By construing the reservation in the 1951 Deed as excepting only coal and mineral beneath the surface and extractible by deep mining, we conclude that the rock herein was not included within the mineral reservation.[10] Thus, it necessarily follows that there was no trespass to the reserved mineral rights of the Vosburgs, and the processing and crushing of the rock did not constitute a conversion. For these reasons, we reverse the grant of partial summary judgment in favor of the Vosburgs and remand for the entry of summary judgment in favor of NBC.

Order granting partial summary judgment reversed. Case remanded for entry of summary judgment in favor of NBC. Jurisdiction relinquished.

Judge DONOHUE joins this opinion.

Judge ALLEN files a dissenting opinion.

DISSENTING OPINION BY ALLEN, J.:

I respectfully dissent from the Majority.

The trial court, in its December 3, 2010 order, recounted the factual and procedural background of this case as follows:

[ ] The Complaint was filed [by Vosburg] in Equity to the above-captioned number on October 11, 2002 as a case in trespass, and conversion of the mineral rights held by [Vosburg]. [Appellant and PAID] hold title to the surface rights of the parcel of land located in Pittston Township. However, [Vosburg] claims the rights to the alleged "Mineral Estate" retained by a reservation clause contained in Deed dated May 11, 1951 and recorded in Luzerne County Deed Book 1115, page 221. Although the title to the property has eventually passed to [Appellant and PAID], The Mineral Rights Reservation Clause has remained in [Vosburg's] family with no subsequent conveyance by Deed of said reservation. An unrecorded 1976 Bill of Sale purportedly conveying said Reservation of Minerals Rights has been renounced and thus the mineral rights remain in [Vosburg] by alleged intestate inheritance.

[PAID] received the surface right[s] to the property by Deed in 1999 [from the Estate of Michael Fritz]. Said Deed contained a standard subject to all reservations, restrictions ... exceptions, etc. clause which thereby incorporated the Mineral Right[s] Reservation Clause

---

10. Since we determined that the parties did not intend to include rock within the mineral rights reservation, it was unnecessary to decide whether the rock herein constituted a mineral.

of the 1951 Deed. On February 27, 2002, [PAID] transferred the property to [NBC] by Deed which contained the same "subject to" clause. After the 2002, transfer, [Appellant] initiated a large construction project on the property for industrial development. The construction necessitated the excavation, processing and refill and grading of hundreds of thousands of tons of rock found on the site both on and under the surface of the property in question to a depth of approximately fifty (50) feet.

[Vosburg's] complaint alleges trespass to the Mineral Rights reserved by [Vosburg] and conversion of the rocks by [Appellant's] removal, processing, and use of the processed rocks and sub-base and fill. The extent of [Vosburg's] monetary damages attendant to the alleged trespass and conversion is <u>not</u> before the court.

Trial Court Opinion, 12/3/10, at 1–2 (underline in original).

The initial 2002 complaint which the trial court referenced provides in pertinent part:

5. The Abstract of title to the property conveyed to PAID by the Fritz Estate Deed (the "Fritz Parcel Chain of Title") reveals that the mineral rights in the Fritz Parcel were previously excepted out and retained by Albert M. Vosburg and Katherine N. Vosburg, his wife, by virtue of their deed to Anthony Fritz dated May 11, 1951 and recorded on May 12, 1951 in Luzerne County Deed Book 1115, page 221 (the "Vosburg to Fritz Deed") which deed contains the following language: "EXCEPTING AND RESERVING all coal and other mineral beneath the surface of said described land, with the right to mine and

remove the same by subterrane mining." [ ]

7. [Vosburg] is the grandson of Albert M. Vosburg and Katherine N. Vosburg[.]

8. [PAID] conveyed to [Appellant] a parcel of real estate (the "PAID Property") which includes a portion of the Fritz Parcel, said portion being approximately 50 acres in size, along with other adjacent lands by that certain deed dated February 27, 2002 and recorded on March 1, 2002 in Luzerne County Deed Book 3002, page 57046 (the "PAID to [Appellant] Deed")[.]

9. To the best of [Vosburg's] knowledge, [Appellant] began excavating hardened shale [1] from the Fritz Parcel on or about January 15, 2002, first under a Right of Entry granted to [Appellant] by PAID and then as the owner of a portion of the Fritz Parcel for the purposes of leveling by cutting and filling the area needed for [Appellant's] land development project as approved by the Luzerne County Planning Commission involving the construction of a 1,010,180 square foot warehouse distribution facility and offices on 105.12 acres of land (the "Warehouse Distribution Facility Land Development") and to provide a suitable sub-base for the buildings, loading docks, parking areas, and access drives which are part of the Warehouse Distribution Facility Land Development Project.

10. To the best of [Vosburg's] knowledge, [PAID] has also excavated hardened shale from the Fritz Parcel, or plans to do so in the near future, to use as a suitable sub-base for the construction of an access road to serve the re-

---

1. The parties have also referred to the disputed material as "rock," and/or "sandstone" throughout their pleadings and briefs.

mainder of the Fritz Parcel and other lands owned by PAID.

11. At all times relevant to this complaint [Appellant and PAID] did not have or obtain the rights to remove minerals from the Fritz Parcel and the mineral rights in and to all minerals within the Fritz Parcel remained of record with Albert M. Vosburg and Katherine N. Vosburg[.]

12. At all times relevant to this complaint [Appellant and PAID] knew, or should have known from the deeds recorded in the public records of the Office of the Recorder of Deeds in and for Luzerne County, Pennsylvania, that they did not own any mineral rights in the Fritz Parcel and, therefore, had no right to excavate and use for their own benefit the hardened shale located in the Fritz Parcel.

13. The hardened shale located in the Fritz Parcel and removed and converted to the use and benefit of [Appellant and PAID] was at all times and is today a mineral as defined under Pennsylvania law.

14. The hardened shale had and has a minimum value of in excess of $3.00 a ton.

15. [Vosburg's] predecessor in interest, Burr B. Vosburg, sent a specimen of rock excavated from the Fritz Parcel to the United States Department of the Interior, Bureau of Mines in 1938 and received a determination letter stating the mineral composition of the rock to be hardened shale (the "Bureau of Mines Letter"), a copy of which letter is attached hereto and incorporated herein as Exhibit F.

16. [Appellant] has excavated and converted to its use and benefit well over one million tons of hardened shale with a minimum approximate value of $3,000,000.00.

17. [PAID] has excavated and converted to its use and benefit an unknown quantity of hardened shale with a minimum approximate value of $3.00 per ton.

18. [PAID] has also benefitted from [Appellant's] excavation and conversion of hardened shale from the Fritz Parcel as the presence of the hardened shale on the Fritz Parcel increased the purchase price received by PAID from [Appellant] for the entire property sold in so far as [Appellant] took into account in formulating the purchase price for the PAID real estate the savings to it of not having to purchase and truck the necessary minerals to the building site.

19. [Vosburg] and [his] predecessors in interest to the mineral rights in the Fritz Parcel have in the past, prior to the purchase of the Fritz Parcel by PAID, excavated and removed hardened shale from the Fritz Parcel by surface excavation and mining for resale and for their own use.

Complaint, 10/11/02, at 1–3.

The above-referenced correspondence from the United States Department of the Interior Bureau of Mines provided in pertinent part:

Dear Mr. [Burr B.] Vosburg:

In reply to your letter of April 30, with which you sent a specimen for determination:

The specimen is hardened shale and besides aluminum silicates contains a little lime carbonate and a little mica. It probably varies somewhat in composition from place to place and the lime carbonate especially may vary.

Yours faithfully,

John W. Finch,

Director

Correspondence, 5/18/38.

In preliminary objections to Vosburg's 2002 complaint, Appellant averred, *inter*

*alia,* that "[Appellant], as the owner of the property, owns the surface of the land and, as the 'surface owner,' retains all rights to the minerals other than coal that are located in the portion of the ground between the coal seam and the surface." Preliminary Objection[s] of [Appellant] to [Vosburg's] Complaint, 12/2/02, at 2 (unnumbered).

In reply to Appellant's preliminary objections, Vosburg averred:

6. Denied. [Appellant] went far beyond its legal right to use the surface of its property when it excavated by blasting hardened shale, a mineral, to a depth in excess of fifty (50') feet and processed the hardened shale by means of a portable rock crusher brought onto the Fritz Parcel into various products including but not limited to shot rock, various grades of manufactured stone such as pipe bedding, 2B gravel, 2B modified stone, and Nos. 3, 4, and 5 stone used for rock lined drainage ditches.

⁂        ⁂        ⁂

9. [Vosburg's] predecessors in title to the mineral rights had entered into the Fritz Parcel by way of a Township Road which cut through the Fritz Parcel as shown on the Luzerne County Tax Maps, a copy of the relevant portion of which is attached hereto and incorporated herein as Exhibit 'A', and had conducted open pit quarrying of hardened shale located upon the Fritz Parcel before and after the conveyance of the surface of the Fritz Parcel.

[Vosburg's] Answer to [Appellant's] Preliminary Objections, 1/15/03, at 2. Vosburg subsequently filed an amended complaint, which incorporated, *inter alia,* the foregoing averments regarding his predecessors' entry onto the Fritz Parcel for quarrying purposes using the township road referenced above. *See* Amended Complaint, 1/15/03, at 4 (unnumbered). On June 11,

2003, Vosburg filed a third amended complaint, which *inter alia,* added additional plaintiffs.

In its answer and new matter to Vosburg's third amended complaint, Appellant "denied that it excavated and converted to its use hardened shale in any significant amount from the Fritz Parcel." Appellant's Answer and New Matter [to Vosburg's Third Amended Complaint], 7/1/03, at 6. Appellant further "denied that the hardened shale has a minimum value of in excess of $3.00 a ton. To the contrary, the value of hardened shale in place is a small fraction of $3 per ton." *Id.*

On June 10, 2010, Vosburg moved for partial summary judgment. *See generally* Vosburg's Motion for Partial Summary Judgment, 6/10/10. In granting summary judgment in Vosburg's favor and against Appellant, the trial court explained:

There are two questions presented to the Court[.] The first centers on the interpretation of the Mineral Rights Reservation of the 1951 Deed and its relationship, of any, to 'rock'. Secondly, if the Court finds said 'mineral' rights applicable to 'rock,' is the processing of the rock and refilling and grading the subsurface of the land with the processed rocks a 'conversion'[?]

The Mineral Rights Reservation Clause of the 1951 Deed reads as follows:

'... all coal and other mineral beneath the surface of said described land with the right to receive and remove the same by subterranean mining[.]' (emphasis added).

A 'mineral' is defined as follows:

'a naturally occurring, inorganic, crystalline solid with definite chemical composition and characteristic physical properties.' *Environmental Science, a Global Concern,* 9th Ed., by

William C. Cunningham, Mary Ann Cunningham and Barbara Woodsworth Saigo.

The Courts of the Commonwealth have defined 'mineral' in various cases as including stone and rock [*Hendler v. Lehigh Valley R.R. Co.*, 209 Pa. 256, 58 A. 486 (1904) ] and everything not of the mere surface. [*Highland v. Commonwealth of Pa.*, 400 Pa. 261, 161 A.2d 390 (1960) ]. Upon review of these cases and the geological textbook definition, the Court finds rock to be a mineral.

Taking the Downey Declaration submitted by [Appellant and PAID], the ... operation included extensive excavation ('cut and fill') of 482,364 cubic yards, embankment work, regarding and filling. The description clearly was well beyond 'surface' work on the parcel. Further, the Downey Declaration confirms that the 'rock' was crushed and processed into a different form and the new form of rocks was used as fill. [Appellant and PAID's] excavation activities even required bringing onsite an additional 12,800 cubic yards of off-site fill in order to reestablish the terrain at the surface. The excavation, processing and refilling of the parcel described by [Appellant and PAID's] expert indicates a clear trespass of the Mineral Rights Reservation by [Vosburg].

As to the question of conversion by [Appellant and PAID], the term 'conversion' has been defined most recently in the *Paves v. Corson* case [765 A.2d 1128 (Pa.Super.2000) ] as:

'the deprivation of another's right of property in, or use or possession of a chattel without the owner's consent and without lawful justification.'

[Appellant and PAID] argue that the rock found on site remains on site albeit displaced and leveled and used as fill. However, the processing and crushing of the rocks themselves as described by Downey is a deprivation of [Vosburg's] use or possession of the chattel (rock) itself. [Appellant and PAID] have transformed the nature and species of the various rock boulders. The rocks in their original non-processed, non-fill state could have had various other uses for [Vosburg] (e.g. walls, stabilizing support, etc). [Appellant and PAID] have completely possessed the rocks transforming them into fill for [Appellant and PAID's] uses (industrial site development) and thereby deprived [Vosburg] of the use or possession of the rocks themselves.

Trial Court Opinion, 12/3/10 at 2–4.

Following the trial court's issuance of its December 3, 2010 order, our Supreme Court published its opinion in *Butler v. Charles Powers Estate*, 620 Pa. 1, 65 A.3d 885, 898 (2013), ruling that in interpreting private deed reservation clauses within the ambit of oil and gas actions, natural gas would not be considered a mineral because it was "non-metallic [in] nature." On March 11, 2014, relying on *Butler*, Appellant moved to vacate the trial court's December 3, 2010 order, and for summary judgment in Appellant's favor.

As succinctly summarized by Vosburg:

[A]s part of the briefing in advance of the trial court's 2014 order, [Vosburg] submitted affidavits from ... Albert M. Vosburg Jr. and [Vosburg] stating the following evidence of the parties to the deeds' intention that the reservation encompass:

1) that the grantor herein, Albert M. Vosburg, owned a stone quarry in the immediate neighborhood of the Fritz Parcel and sold stone produced from this quarry [FN3: This quarry is referred to in the chain of title as the 'Bown quarry,' *see* deeds attached to Albert M. Vosburg Jr. Affidavit at R.

482a–484a.]; *See* Exhibit A, Second Affidavit of Albert M. Vosburg, Jr. at 11412, R. 474a–475a. *See also* exhibit B thereto, deed establishing that Albert M. Vosburg owned the Bown Quarry Property from 1913–1969.

2) that Albert M. Vosburg actually employed Anthony Fritz in this stone quarry and had him sell stone as part of his employment duties; *See Id.* at ¶¶ 14–17, R. 476a.

3) that Albert M. Vosburg offered Anthony Fritz the surface of the Property for $5,000 and the Property with no mineral or rock reservations for $10,000. *See Id.* at ¶¶ 14–16, R. 476a. Because Mr. Fritz sold stone for Albert M. Vosburg, both parties understood that the same stone found in the neighboring quarry was likely under the Fritz property. *Id.*

4) Mr. Fritz and Albert M. Vosburg understood that the stone had commercial value because they both sold the stone to the Borough of Avoca. *Id.* at ¶¶ 12–17, R. 476a.

Vosburg's Brief at 5–6.

The trial court heard arguments on Appellant's motion for summary judgment on May 27, 2014. On June 3, 2014, the trial court denied Appellant's motion to vacate its prior order and for summary judgment; the trial court granted summary judgment to Vosburg. Following this Court's September 18, 2014 order granting review of the trial court's order, Appellant filed a timely notice of appeal.

Appellant's issues on appeal concern the trial court's determination that the term "mineral" within the private deed reservation clause includes rock. In reviewing Appellant's claims, I recognize that:

> In construing a deed or a contract, certain general principles must be kept in mind. First, it is the intention of the parties *at the time of entering in thereto that governs,* and such intention is to be gathered from a reading of the entire contract[.] *Philip Morris & Co. v. Stephano Bros.,* (1938), 331 Pa. 278, 200 A.2d [A.] 605; *Maxwell v. Saylor,* (1948), 359 Pa. 94, 58 A.2d 355. In addition, "Contracts must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language. (Citing cases). Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, *while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.* [FN1: Emphasis ours] If one construction would make it unreasonable, while another would do justice to both parties, the latter will be adopted[.]" *Percy A. Brown & Co. v. Raub,* (1947), 357 Pa. 271, 287, 54 A.2d 35, 43. It is also beyond controversy, that a written document must be construed most strongly against the parties drafting it[.] *Cities Service Oil Co. v. Haller,* (1958), 393 Pa. 26, 142 A.2d 163. It is equally well fixed in the law that a doubtful reservation or exception in a deed will be construed most strongly against the grantor and in favor of the grantee[.] *Bundy v. Myers,* (1953), 372 Pa. 583, 94 A.2d 724; *Sheffield Water Co. v. Elk T. Co.,* (1909), 225 Pa. 614, 74 A. 742. This rule applies with special force to a reservation or exception which amounts to cutting down of the grant[.] *Klaer v. Ridgway,* (1878), 86 Pa. 529.

\* \* \*

[ ] Further, the standard of interpretation to be applied is the meaning that would be attached by a reasonably intelligent person, *acquainted with all operative usages, and knowing all the circumstances prior to and contemporaneous with the making of the contract* [.] Restatement, Contracts § 320; *Clearfield Development Corp. v. Devonian Co.,* (1956), 385 Pa. 248, 122 A.2d 718.

*Wilkes–Barre Tp. School District v. Corgan,* 403 Pa. 383, 170 A.2d 97, 98–99 (1961).

Initially, I find that Appellant's reliance on *Butler* is misplaced. *Butler* addresses private deed reservations of mineral rights, specifically natural gas, within *an oil and gas* agreement, which is inapposite to the scenario before us. The pronouncements of the Supreme Court in *Butler* reiterated that under Pennsylvania law, *natural gas and oil* are presumptively not minerals due to *their* non-metallic nature, and are thereby presumptively excluded from the term "mineral" within private deed reservation clauses.

Specifically, the Supreme Court in *Butler* explained:

**The [trial] court noted that Pennsylvania law has long recognized a rebuttable presumption that "if, in connection with a conveyance of land, there is a reservation or an exception of 'minerals' without any specific mention of natural gas or oil, ... the word 'minerals' was not intended by the parties to include natural gas or oil."** *Highland,* **161 A.2d at 398 (citing** *Dunham,* **101 Pa. at 44).** **This precept, commonly known as the** *Dunham* **Rule, may be rebutted by a challenger through clear and convincing evidence that the intent of the parties, at the time of the conveyance, was to include natural gas and/or oil.** *Id.* **at 400. The trial court finally stated that the notion that natural gas and oil are not,**

for purposes of private deed transfers, considered minerals is "entrenched" within Pennsylvania law. *See* C.C. Marvel, Annotation, *Oil and gas as "minerals" within deed, lease, or license,* 37 A.L.R.2d 1440, at *3.

\* \* \*

The [*Highland*] Court ... recognize[ed], as did its predecessors, that mankind generally divided all known matter into three categories—animal, vegetable, and mineral—and that petroleum and natural gas are unquestionably minerals under that broad categorization. *Id.* at 398. Nonetheless, we reaffirmed that for deed reservations we must assume, absent evidence to the contrary, that mineral is a term of "general language, and presumably is intended in the ordinary popular sense which it bears among English speaking people," *i.e.,* metallic substances and not oil and gas. *Id.* **Thus, the** *Dunham* **Rule, a well-established and relied upon rule of property, continues to bind all situations in which a deed reservation does not expressly include oil or natural gas within the reservation.** *Id.* at 398–99. Indeed, such a conclusion was demanded by the long-standing jurisprudence of this Commonwealth concerning property law: "A rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice." *Id.* at 399 n. 5 (quoting, *e.g., Smith v. Glen Alden Coal Co.,* 347 Pa. 290, 32 A.2d 227, 234 (1943)).

\* \* \*

We thus turn to the continuing viability of the *Dunham* Rule, and we reaffirm that the rule continues to be the law of Pennsylvania. [ ] Notwithstanding this Court's recognition that various statutes, such as the Municipalities Planning

Code, categorize natural gas as a mineral, as [a]ppellants aptly note, we recently reiterated that "**Pennsylvania common law has applied a rebuttable presumption in the context of a private deed conveyance that the term 'mineral' does not include oil or gas.**" *Huntley,* 964 A.2d at 858. **We see no reason, nor has any party or court provided us with one, to depart from this entrenched rule.**

\*　　\*　　\*

The *Dunham* Rule is clear, dating back to *Gibson,* that the common, layperson understanding of what is and is not a mineral is the only acceptable construction of a private deed. **Notwithstanding different interpretations proffered by other jurisdictions, the rule in Pennsylvania is that natural gas and oil simply are not minerals because they are not of a metallic nature, as the common person would understand minerals.** *Gibson,* 5 Watts at 41–42; *see also Dunham,* 101 Pa. at 44. The *Highland* decision made clear that the party advocating for the inclusion of natural gas within the deed reservation (here [a]ppellees) bears the burden of pleading and proving by clear and convincing evidence that the intent of the parties who executed the reservation was to include natural gas. 161 A.2d at 398–99. Critically, however, such intention may only be shown through parol evidence that indicates the intent of the parties at the time the deed was executed-in this case, 1881. *Id.*

Of course, in 1881, the law of Pennsylvania was *Gibson* and *Moore, supra* pp. 889–90, which clearly stated two overarching principles: (1) anything of a non-metallic nature would not be considered a mineral for private deed purposes; *Gibson,* 5 Watts at 41–42; and (2) when interpreting private deeds and contracts, the "question is to be determined not by principles of science, but by common experience directed to the discovery of intention." [*Schuylkill Nav. Co. v.*] *Moore,* 2 Whart. [477] at 493 [ (1837) ]; *see also Gibson,* 5 Watts at 44. Both of these principles have been adopted and utilized by the courts implementing the *Dunham* Rule. Accordingly, to the extent the Superior Court ordered an evidentiary hearing with expert testimony concerning Marcellus shale natural gas, and the scientific nature thereof, such an order violated the *Dunham* jurisprudence. **Simply put, natural gas is presumptively not a mineral for purposes of private deeds.**

*Butler,* 65 A.3d 885, 886–898 (2013) (footnotes omitted) (emphasis supplied). Accordingly, *Butler* is not applicable, and I reject Appellant's assertion that a reading of *Butler* supports vacating the trial court's December 3, 2010 order or reversing the trial court's June 3, 2014 order.

Rather, I find that *Butler* reiterates the well-settled precept that the interpretation of the "coal and other mineral" clause within the private deed at issue here is "to be determined not by principles of science, but by common experience directed to the discovery of intention." *Butler,* 65 A.3d at 898. In engaging in a "discovery of intention," I acknowledge that "[w]hile it is true that a reservation or exception in a deed will be construed against the grantor, it is equally true that this reservation and exception must be taken into account when attempting to interpret the deed as a whole and glean the intention of the parties therefrom." *New Charter Coal Co. v. McKee,* 411 Pa. 307, 191 A.2d 830, 835 (1963) *citing Wilkes–Barre Township,* 170 A.2d at 99.

In analyzing the phrase "or other mineral" vis á vis sand, our Supreme Court determined that sand was excluded in the following scenario, and explained:

The first question presented by this case is whether the sand, the taking of which is the trespass sued for, is a mineral, within the meaning of the deed between the parties. **In the broadest sense, as belonging to one of the three great divisions of matter—animal, vegetable, and mineral—sand, of course, is a mineral. In the more restricted scientific sense, sand may or may not be a mineral, according to what it is composed of.** In the language of mineralogists, air and water are minerals, while granite and similar rocks are not minerals, but aggregations of minerals. So it is of sand. It may be wholly of grains of silex or other mineral, or it may be of several mixed together, and therefore in the technical sense only grains of rock. It is perfectly clear that the parties here did not use the word 'mineral' in either of the foregoing senses. The first grantor with whom we are concerned, the Northern Coal & Iron Company, conveyed the land to Jumper, reserving 'all coal and other minerals, in, under and upon said land'; Jumper conveyed to defendant with a similar reservation; and the subsequent deed by defendant to plaintiff conveyed the 'surface' of the land, 'excepting and reserving as fully and entirely as in the said [preceding] indenture is excepted and reserved, and further excepting and reserving all the gravel necessary for any fill or ballast for the railroad,' etc. If the word 'mineral' had been used in either of the senses already mentioned, it would, as a matter of course, have included gravel, and the additional special reservation of the gravel shows that the parties did not consider it as included in the preceding general reservation.

But there is another, and what may be called the commercial sense, in which the word 'mineral' is used, and in which, having reference to its supposed etymology of anything mined, it may be defined as any inorganic substance found in nature, having sufficient value, separated from its situs as part of the earth, to be mined, quarried, or dug for its own sake or its own specific uses. That is the sense in which it is most commonly used in conveyances and leases of land, and in which it must be presumed that it was used by these parties in the deed in question. 'Coal and other minerals'— the expression used—indicate substances which, like coal, have a value of their own, apart from the rest of the land, sufficient to induce the expense and labor of severance for their own sakes. These the grantor intended, and expressed the intention, to except from his grant and reserve to himself. While coal was the principal and perhaps the only thing clearly in view, yet the reservation was not meant to be limited to that, for then the addition 'and other minerals' would be superfluous and misleading. A vein of fine marble would clearly be reserved, and so, probably, if near enough a market to have a value, would be granite or limestone, or other building material, potter's or porcelain clay, and the like. Sand might or might not be in this category. A vein of pure white quartz sand, valuable for making glass or other special use, would be within the reservation, while common mixed sand, merely worth digging and removing as material for grading, would not be. The referee has found that the sand which is the subject of the present contention was of this latter character, and was taken and used, not for any

intrinsic value or use of its own, but as part of earth and other material to fill up the roadbed to the proper grade. So regarded and used, it was not within the reservation.

*Hendler v. Lehigh Valley R.R. Co.*, 209 Pa. 256, 58 A. 486, 487 (1904) (emphasis supplied).

Appellant states that *Hendler* was overruled by *Hall v. Delaware, L & W, R & Co.*, 270 Pa. 468, 113 A. 669, 670–671 (1921). *See* Appellant's Brief at 20. However, a close reading of *Hall* reflects that the Supreme Court did not overrule *Hendler's* analysis of the term "mineral," nor did they overrule *Hendler's* requirement of an examination of the deed's language, the intent of the parties as expressed therein, and the attendant circumstances to the deed's execution, prior to including a disputed mineral within a reserved mineral estate.

Indeed, in *Silver v. Bush*, 213 Pa. 195, 62 A. 832 (1906), the Supreme Court emphasized that "[t]he variations in the scope of the word [mineral] arise from the connection and application in which it is used," and the "cardinal test of the meaning of any word in any particular case is the intent of the parties using it." *Id.* at 833–834. Specifically, the *Silver* Court explained:

The crucial question here, as in all contracts, is, what was the sense in which the parties used the word? Mineral is not *per se* a term of art or of trade, but of general language, and presumably is intended in the ordinary popular sense which it bears among English speaking people. It may in any particular case have a different meaning, more extensive or more restricted, but such different meaning should clearly appear as intended by the parties. A very recent discussion of the subject was had in *Hendler v. Lehigh Valley R.R. Co.*, 209

Pa. 256, 58 Atl. 486, 103 Am.St.Rep. 1005, where it was shown that while the word 'mineral' has a very broad meaning, already alluded to, and also a more restricted scientific use, it has also a commercial sense, in which it is most commonly used in conveyances and leases of land, and in which it may be presumed to be used in such instruments. In that sense it may include any inorganic substance found in nature having sufficient value separated from its situs as part of the earth to be mined, quarried, or dug for its own sake or its own specific uses. But, though it may include all such substances, it does not necessarily do so. Appellant cites the case as authority for the view that whatever comes within the terms of that description must necessarily be included under the word 'mineral.' But this is an untenable inference. Th[e] [*Hendler*] decision announced no new principle, nor any departure from the line of previous decisions. As already said, there is no discrepancy in the cases. **The cardinal test of the meaning of any word in any particular case is the intent of the parties using it, and all that *Hendler v. R.R. Co.* did was to apply that test to the word 'mineral' in the deeds on which the case turned. The substance there in question was sand, and it was shown that it might or might not be within the definition of mineral in the commercial sense, according to the circumstances and the intent of the parties.**

*Silver v. Bush*, 62 A. at 833 (Pa.1906) (emphasis supplied).

Citing *Hendler* and *Silver*, the United States District Court in the Western District of Pennsylvania recently reasoned in *PAPCO, Inc. v. U.S.*, 814 F.Supp.2d 477

(W.D.Pa.2011)[2]:

In the analysis of whether a substance is a "mineral" within the scope of a mineral reservation, the crucial question is: "What was the sense in which the parties used the word?" *Silver v. Bush*, 213 Pa. 195, 62 A. 832, 833 (1906); *see also Highland v. Commonwealth*, 400 Pa. 261, 161 A.2d 390, 398 (1960).[ ] A mineral has been defined broadly as "everything not of the mere surface, which is used for agricultural purposes; the granite of the mountain as well as metallic ores and fossils, are comprehended within it." *Griffin v. Fellows*, 81 1/2 Pa. 114, 1873 WL 11950, *9 (Pa.1873). It can also be defined by evidence of the parties' knowledge of the type of minerals present on the land at the time of conveyance. *See Gibson*, 1836 WL 2957 at *5, 7 (Court stated "it appears ... that both parties ... came to the knowledge of the fact that the mineral called chrome ... was found on this tract," and combined with the language of the deed, the Court found that chromate was included within the mineral reservation).

A mineral may also be defined in the commercial sense, in which a mineral is "any inorganic substance found in nature, having sufficient value, separated from its situs as part of the earth, to be mined, quarried, or dug for its own sake or its own specific use." *Hendler v. Lehigh Valley R.R. Co.*, 209 Pa. 256, 58 A. 486, 487 (1904) (*overruled on other grounds* by *Hall v. Delaware, Lackawanna & W. R.R. Co.*, 270 Pa. 468, 113 A. 669 (1921)). When the parties intend to define minerals by its commercial sense, substances included within this definition have their own value that is apart from the rest of the land. *Hendler*, 58 A. at 487.

The [*Hendler*] court went on to further state that such substances as granite, limestone, clay, and other building material would also be within a mineral reservation if they had a commercial value. *Id.* Therefore, since the sand did not have any commercial value, the court ruled that the parties did not intend to include the sand within the mineral reservation. *Id.*

As in *Hendler*, the language in the Jamieson Deed indicates the parties' intention to include as "minerals" substances that have their own value apart from the land. *Hendler*, 58 A. at 487. The Jamieson Deed reserved "all the oil, natural gas, glass sand and minerals of every kind and description whatsoever." Jamieson Deed at 439. The specific reservation of oil, natural gas, and glass sand indicates that the parties intended that substances that have commercial value are within the scope of the reservation. *Hendler*, 58 A. at 487. Thus, the critical question is whether "sandstone" has commercial value and is included within the mineral reservation of the Deed.

Unlike the sand in *Hendler*, sandstone located in the Allegheny National Forest has its own commercial value apart from the land. Sandstone was regarded as a commercially valuable mineral at the time of the conveyance of the Jamieson Deed. *Pennsylvania's Mineral Heritage: The Commonwealth at the Economic Crossroads of Her Industrial Development* (1944), Attach-

---

**2.** "While 'federal court decisions do not control the determinations of the Superior Court,' whenever possible, Pennsylvania courts 'follow the Third Circuit [courts] so that litigants do not improperly "walk across the street" to achieve a different result in federal court than would be obtained in state court.'" *Parr v. Ford Motor Co.*, 109 A.3d 682, 693 n. 8 (Pa.Super.2014) (*en banc*) (internal citations omitted).

ment 10 to Ex. A to Pl.'s Br. Supp. (noting longstanding stone industry in Pennsylvania, including "1.4 million tons of sandstone ... produced ... for commercial purposes" in 1930, the same year the Jamieson Deed was executed, at 50–51, and commercial use of sandstone for highway construction, at 156, 193). The parties of the Jamieson Deed were likely aware of the commercial value of sandstone, and that sandstone was present on the Jamieson Tract. As such, we find that since the parties to the Jamieson Deed intended to include commercially valuable minerals within the mineral reservation, and because sandstone was regarded as a commercially valuable mineral at the time of the Jamieson Deed conveyance, sandstone is within the scope of the mineral reservation of the Jamieson Deed. Therefore, the sandstone at issue in this case belongs to PAPCO.

*PAPCO, Inc. v. U.S.*, 814 F.Supp.2d at 477.

Here, applying the cardinal test emphasized in *Silver* to the instant deed, and mindful of the sound rationale espoused in the *Hendler* and *PAPCO* decisions, I find that the challenged rock was reserved within Vosburg's mineral estate, and I would affirm the trial court's interpretation of the term "mineral" within the deed's reservation clause as inclusive of rock. *Hendler*, 58 A. at 487 (material would "clearly be reserved" where it had its own value as "building material," and "sufficient value separated from its situs as part of the earth to be mined, quarried or dug for its own sake or its own specific uses," and not just as a common material which was moved superficially to fill and regrade the land); *see also PAPCO*, 814 F.Supp.2d at 495 (material was a reserve mineral where the material was "a commercially valuable mineral at the time," where parties to the deed "were likely aware of the commercial value of" the

material, that "[t]he challenged material" "was present on the [land,]" and where the "parties to the [deed] intended to include commercially valuable minerals within the mineral reservation"). The phrase "*coal and* other mineral" within the deed's reservation clause signifies the intent to reserve commercially valuable assets. Deed, May 11, 1951, at 1 (emphasis supplied). There was documented knowledge well before the execution of the 1951 deed that rock was present on the property's surface and subterraneously. *See* Correspondence, United States Department of the Interior Bureau of Mines, 5/18/38.

In *Hendler*, the fact finding referee determined that the disputed sand was not a reserved mineral because it was "merely worth digging and removing as material for grading" which was "part of the earth ... to fill up the roadbed to the proper grade" without "any intrinsic value or use of its own." *Hendler*, 58 A. at 487. By contrast in this case, and as recognized by the trial court, the rock has value and use of its own. As pled by Vosburg, the rock was the subject of open pit quarrying by Vosburg's predecessors. *See* Complaint, 10/11/02 at 3; Amended Complaint, 1/15/03, at 3–4. While Appellant denied that the rock at issue was hardened shale or even as valuable as pled by Vosburg, Appellant nonetheless conceded, in the alternative, that there was some value to the rock. *See* Appellant's Answer and New Matter [to Vosburg's Third Amended Complaint], 7/1/03, at 6 (Appellant "denied that the hardened shale has a minimum value of in excess of $3.00 a ton. To the contrary, the value of hardened shale in place is a small fraction of $3 per ton."). Moreover, the rock had value as building material, and was "extensive[ly] excavat[ed]" by Appellant for such purpose down to approximately 50 feet below the ground. *See* Trial Court Opinion, 12/3/10,

at 3–4; *see also Hendler, supra* (categorizing a material as a mineral in the commercial sense, if it had "value" as a "building material . . . and the like"). I agree with the trial court that the "rocks in their original non-processed, non-fill state could have had **various other uses for [Vosburg] (e.g. walls, stabilizing support, etc)**." Trial Court Opinion, 12/3/10, at 4. Therefore, I would affirm the trial court's determination that the challenged rock was reserved within Vosburg's mineral estate.

In sum, I would affirm the trial court's June 3, 2014 order which denied summary relief to Appellant and which declined to vacate the December 3, 2010 order granting summary judgment to Vosburg.